**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| ROBERT A. C. MURPHY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:21-CV-954-JEM |
| | ) | |
| RON NEAL, *et al*., | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter is before the Court on a motion for summary judgment ECF 122 filed by the defendants. Murphy filed a response to the motion for summary judgment, and the defendants filed a reply, so it is now fully briefed and ripe for ruling. ECF 127, 128, 129.

**I.    Background**

Robert Murphy, a prisoner without a lawyer, is proceeding in this case "against Warden Ron Neal, Major Wardlow, Lt. Lott, Counselor Craig, and Pest Control Officer Kay in their individual capacities for compensatory and punitive damages for holding him in unconstitutional conditions of confinement in Indiana State Prison's D-Cell House from approximately mid-June 2021 through mid-August 2021, due to smoke exposure in violation of the Eighth Amendment." ECF 63 at 6.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its

1

own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Summary judgment "is the put up or shut up moment in a lawsuit . . .." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

The parties have filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## II.    Facts

At his deposition, Murphy testified to the following facts: Between June 18, 2021, and September 3, 2021,[1] Murphy was housed in D-Cell House ("DCH") due to a pending disciplinary charge. ECF 116 at 8-9, 33-34. He was housed in a single-occupancy cell without any roommate. *Id.* at 9. The entire time he was housed in DCH, Murphy was exposed to second-hand smoke due to inmates in the cellhouse smoking what he believed was synthetic marijuana, or "tune" and setting fires. *Id*. Murphy could not see any visible smoke but could smell it in the air. *Id.* He could not tell where the smoke was coming from and was not sure if it was from his neighbor's cell or from other cells in the cellhouse. *Id.* at 10. At night, he could see flashes of light that he believed were caused by inmates using power outlets to light drugs to smoke. *Id.* at 9-10. The smell of smoke was constant in the cellhouse, and Murphy only escaped it when he went outside for recreation. *Id.* at 11. Murphy has asthma, and the smoke smell made it hard for him to breathe, gave him headaches, and caused him to wake up out of his sleep. *Id.* at 12-13, 16. However, he

---

[1] Murphy testified he left DCH "about" September 1, 2021, and the defendants provide evidence the actual date of his cell transfer was September 3, 2021. ECF 122-2 at 4. To the extent there's any dispute over this fact, the dispute is not material.

never used any over-the-counter sleep-aid or pain relief medications while in DCH. *Id.* at 18, 50-51. He used a mask or sheet to cover his face as often as possible. *Id.* at 12-13, 16. Murphy did not recall ever seeing any other inmates or guards having coughing fits or having difficulty breathing in DCH, and never heard any smoke alarms or detectors go off. *Id.* at 56, 58-59.[2] On two occasions while Murphy was housed in DCH, firefighters were called to the cellhouse to put out fires. *Id.* at 27-29. Murphy did not know if DCH had a ventilation system, but they kept the front and back doors open to let in fresh air. *Id.* at 58-59.

Murphy discussed his issues with the smoke in DCH with Counselor Craig and Lt. Lott whenever he saw them, and they indicated they would speak to someone about the issue but never followed up. ECF 116 at 13-14. He never had any direct conversations with Warden Neal or Major Wardlow about his issues with the smoke in DCH. *Id.* at 15. He never spoke about his issues with the smoke to medical staff because he did not believe there was anything they could do about it. *Id.* at 16-17. No physician ever ordered that Murphy be housed in a smoke-free environment. *Id.* at 52. On September 3, 2021, Murphy was transferred out of DCH and back to I-North, where the smoke was less severe. *Id.* at 33-34. After the transfer, Murphy began having heart issues which he attributed to the smoke exposure in DCH. *Id.* at 34-40.

The defendants provide Murphy's medical records, which show the following facts: Throughout his stay in DCH, Murphy was seen regularly by medical providers, but his medical records contain no mention of any issues attributed to smoke exposure. Specifically, on June 18, 2021, a nurse examined Murphy and documented his vital signs were normal and there were no issues precluding his placement in DCH. ECF 113-1 at 334-37. The nurse noted Murphy had an active prescription for a Xopenex inhaler. *Id.* at 335.

---

[2] The defendants provide evidence DCH had approximately 43 different devices designed to detect smoke or fire, each of which passed inspection on July 29, 2021. ECF 102-1 at 224-233.

On June 21, 2021, Murphy was evaluated by Dr. Christina Chico, who noted he denied any issues with sleeping or maintaining activities of daily living. ECF 113-1 at 332. On July 12, 2021, Murphy was evaluated by a medical professional who noted he showed no visual signs that elicited concern. ECF 113-1 at 325-26.

On August 1, 2021, Murphy submitted a Healthcare Request Form ("HCRF") complaining of itchy feet and "red spots popping up" on his body, which he attributed to mice. ECF 113-1 at 91. On August 10, 2021, Murphy was examined by a nurse for a chronic care visit who documented his asthma symptoms had "stabilized" and were considered "seasonal." *Id.* at 319-22. Murphy's lungs were normal upon inspection and he was negative for hoarseness, sinusitis, coughing, wheezing, chest pain, and irregular heartbeat, but his blood pressure was slightly elevated. *Id.* at 320. On August 11, 2021, Murphy was again evaluated by a medical professional who noted he showed no visual signs that elicited concern. ECF 113-1 at 317-18.

On August 13, 2021, Murphy was evaluated by a nurse in connection with his HCRF and provided anti-fungal cream for his feet and Tylenol for the associated pain. ECF 113-1 at 314-16. The nurse did not note any complaints regarding Murphy's lungs, asthma, or breathing, and found his vital signs were normal except for slightly elevated blood pressure. *Id.*

On August 22, 2021, Murphy submitted a new HCRF asking for a refill of his Minerin cream, which was refilled later that week. ECF 113-1 at 90. On August 25, 2021, Murphy submitted a third HCRF stating the anti-fungal cream for the blisters on his feet was not effective. *Id.* at 89. None of Murphy's HCRFs mentioned any complaints regarding smoke exposure or any issues with his lungs, asthma, breathing, or chest. *Id.* at 89-91. On September 2, 2021, Murphy was evaluated in response to his third HCRF by a nurse, who concluded his blisters had resolved. *Id.* at 310-13. The nurse did not note any complaints regarding Murphy's lungs, asthma, breathing, or heart, and noted his lungs were normal on inspection. *Id.*

In October 2021, once Murphy had been moved out of the DCH and was housed in the I-North housing complex, he underwent two chest x-rays during an annual wellness encounter. ECF 113-1 at 291, 293-96. A nurse examined Murphy and noted his respiratory system was normal but his blood pressure was slightly elevated. *Id.* at 293-94.

On May 2, 2022, Murphy complained of chest pain and an EKG was obtained. ECF 113-1 at 262-65. The EKG showed one premature ventricular contraction, but found Murphy's breathing was even and his lungs were clear. *Id.* at 264.

On May 12, 2022, Dr. Marthakis evaluated Murphy, ordered additional labs, diagnosed him with hypertension, and started him on low dose Coreg twice a day to help lower his blood pressure. ECF 113-1 at 258-61.

On September 16, 2023, Murphy was evaluated by a nurse for complaints of "feeling off," which he stated originally started when he was housed in DCH. ECF 113-1 at 174-77. The nurse diagnosed Murphy with palpitations and ordered an echocardiogram. *Id.* at 176. The next week, Murphy underwent an echocardiogram and was told by a doctor at the hospital that he had high blood pressure, consistent with his age and ethnicity. ECF 103-1 at 37; ECF 116 at 42, 51.

Because neither party disputes these facts, the Court accepts them as undisputed.

### III.    Analysis

The Eighth Amendment requires prison officials "must provide humane conditions of confinement . . . and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Conditions of confinement must be severe to support an Eighth Amendment claim. "[T]he prison officials' act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* at 834. The Eighth Amendment protects prisoners only from conditions that "exceed[] contemporary bounds of decency of a mature, civilized society."

5

*Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). In other words, "[a]n objectively sufficiently serious risk is one that society considers so grave that to expose any unwilling individual to it would offend contemporary standards of decency." *Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (quotation marks and citations omitted).

In *Helling v. McKinney*, 509 U.S. 25 (1993), the Supreme Court held that a prison inmate could challenge as a violation of the Eighth Amendment his involuntary exposure to environmental tobacco smoke ("ETS"). However, the Court did not recognize an absolute right to a smoke-free environment. Rather, the Court held that the plaintiff must satisfy a two-part test to succeed on such a claim. First, there is an objective component in which the plaintiff must show that he is "being exposed to unreasonably high levels of [ETS]." *Id.* at 35. A plaintiff can either show a present injury by providing evidence he has "serious existing health problems" due to second-hand smoke exposure, or may show future injury by providing evidence the defendants "exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Henderson v. Sheahan*, 196 F.3d 839, 845-46 (7th Cir. 1999) (alterations and quotation marks omitted); *see also Ball v. Beachem*, No. 22-CV-02219, 2024 WL 3904617, at *6 (N.D. Ill. Aug. 22, 2024) ("Exposure to secondhand smoke may support a conditions-of-confinement claim, but to prevail on such a claim, an inmate must demonstrate that the level of secondhand smoke in his cell was unreasonably high, and that the smoke caused or is likely to cause him serious health problems."). "*Helling* does not say what level of smoke would be 'unreasonably high,' but notes that the plaintiff had a cellmate who smoked five packs a day." *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007) (noting there may be a level of "ambient tobacco smoke that . . . amounts to punishment," and it is up to the Court to determine whether "the plaintiff's claim rises to this level or instead amounts just to a complaint about something more akin to an annoyance than to

6

oppression"). Second, the plaintiff must provide evidence the defendant exposed him to smoke with "deliberate indifference" to his health or safety. *Helling*, 509 U.S. at 35.

The defendants argue summary judgment is warranted in their favor because Murphy cannot satisfy the objective component of his Eighth Amendment claim, as he provides no evidence he was subjected to unreasonable amounts of smoke while housed in DCH. ECF 123 at 5-9. Specifically, the defendants argue Murphy was only housed in DCH for around 77 days, did not have a cellmate, and he testified that he could only smell smoke, he never saw any physical manifestation of smoke, and he never complained to medical staff about any issues related to smoke exposure. *Id.* In his response, Murphy argues he was exposed to unreasonable amounts of smoke in DCH because it made it difficult for him to breathe, made him feel like he was going to die, and forced him to wear two masks in order to breathe adequately. ECF 128 at 6.

Here, there is no evidence by which a reasonable jury could conclude Murphy was exposed to "unreasonably" high levels of second-hand smoke while he was housed in DCH such that it caused him "serious existing health problems" or posed "an unreasonable risk of serious damage to his future health." *See Henderson*, 196 F.3d at 845-46. Specifically, Murphy testified at his deposition that he was only housed in DCH for approximately 77 days, was kept in a single-occupancy cell without a roommate, could not see any visible smoke in the cellhouse, could not tell where the smoke was coming from in the cellhouse, never heard any smoke alarms or detectors go off, and never saw any other inmates or prison staff coughing or struggling to breathe due to the smoke.[3] Moreover, it's undisputed Murphy was regularly seen by medical staff in DCH and

---

[3] Murphy asserted in his response that DCH was constantly filled with "thick smoke with dizzying and suffocating effects" and that staff had to wear masks and sometimes goggles inside the unit. ECF 128 at 6. But his assertion that he could see visible smoke in the cellhouse conflicts with his prior deposition testimony, and should therefore be disregarded. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."). Regardless, any dispute over whether Murphy saw visible smoke in the cellhouse is not material, as the mere fact he could see

submitted three HCRFs, but never complained to medical staff of any issues related to smoke exposure or any issues with his lungs, breathing, or asthma. In light of this evidence, Murphy's testimony that there was a strong smell of smoke in DCH which caused him to have headaches, difficulty breathing, and difficulty sleeping is insufficient to show he was exposed to "unreasonably" high levels of ETS. *See George v. Smith*, 467 F. Supp. 2d 906, 924 (W.D. Wisc. 2006) (facts fell "far short of supporting an inference that plaintiff was exposed to unreasonably high levels of environmental tobacco smoke" where plaintiff offered no evidence showing how often he was put in a position to inhale unreasonably high levels of second-hand smoke and his medical records showed he had only four complaints relating to his asthma over three years); *Ball*, 2024 WL 3904617, at *6-7 (inmate's allegation he experienced blurred vision, vomiting, shortness of breath, migraines, and inflammation due to smoke exposure was not objectively serious enough to implicate constitutional concerns); *Knox v. Butler*, No. 17-CV-572, 2020 WL 3412992, at *3 (S.D. Ill. June 22, 2020) (summary judgment warranted in secondhand tobacco smoke case where plaintiff described only symptoms of coughing, eyes watering, constant headaches, and dizziness); *Gurley v. Sheahan*, No. 06 C 3454, 2009 WL 2178685, at *6 (N.D. Ill. July 21, 2009) (asthmatic inmate who complained about breathing difficulties due to exposure to secondhand smoke did not describe an objectively serious deprivation).

Murphy speculates that the smoke exposure in DCH caused him to develop elevated blood pressure and heart issues because he did not have these medical problems before he entered DCH. But he provides no evidence supporting this belief. Instead, the only evidence in the record regarding the cause of Murphy's high blood pressure is Murphy's testimony that a doctor told him high blood pressure is common for people of his age and ethnicity. *See* ECF 116 at 42, 51; *Vasquez*

---

visible smoke in the cellhouse is insufficient to show he was exposed to such unreasonably high levels of smoke that it posed a risk to his health.

*v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (summary judgment warranted where plaintiff's medical records did not substantiate a causal link between cell conditions and his ailments); *Ball*, 2024 WL 3904617, at *7 ("Unsupported allegations that environmental conditions caused physical ailments that Plaintiff would not otherwise have suffered are insufficient to create a genuine issue of fact"); *Vasquez v. Braemer*, No. 11-cv-806, 2013 WL 4084284, at *14 (W.D. Wis. Aug. 13, 2013) (plaintiff's own beliefs about the cause of his symptoms are insufficient to create a question of fact). Accordingly, Murphy's unsupported allegation that smoke exposure in DCH caused him to develop high blood pressure and heart issues is insufficient to create a genuine issue of fact that he has a present injury due to smoke exposure. Nor does he present any evidence about the general risks he might face from second-hand exposure to the type of smoke he encountered in DCH.

Lastly, Murphy argues in his response that he was not given his inhaler during the time he was housed in DCH. ECF 128 at 12. But the Court explicitly denied Murphy leave to proceed on a claim that his Eighth Amendment rights were violated because he was held in DCH without his inhaler, concluding he did not explain how he was harmed by not having his inhaler for three months. ECF 18 at 4-5. And there is no evidence Murphy ever informed medical staff he was missing or needed his inhaler, despite the fact he submitted several HCRFs and was seen regularly by medical staff while in DCH. Therefore, because Murphy was denied leave to proceed on a claim related to his inhaler and his assertion that he was denied his inhaler is not relevant to whether he was subjected to unreasonable amounts of second-hand smoke in DCH, he cannot rely on this argument to show the defendants violated his Eighth Amendment rights.

After the summary judgment briefing was complete, Murphy filed an unauthorized surreply. ECF 130. The Local Rules provide only for an opening brief by the moving party, a response brief by the opposing party, and a reply brief by the moving party, without leave of court. N.D. Ind. L.R. 56-1. The defendants' reply presented no new evidence that would require a

response from Murphy. ECF 109. Rather, the defendants replied to Murphy's arguments. Therefore, the surreply was not considered when deciding this motion. But even if it were considered, Murphy's main argument in his surreply, as relevant here, is that any amount of smoke or chemicals in the air is harmful and violates the Eighth Amendment. "But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not [an Eighth Amendment violation]." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). As discussed above, there is no evidence that the amount of smoke in the air rose to the level necessary for an Eighth Amendment violation.

Accordingly, because there's insufficient evidence by which any reasonable jury could conclude Murphy was exposed to such "unreasonably" high levels of smoke during his 77-day stay in DCH that it caused or is likely to cause him serious health problems, he has not shown his cell conditions violated his Eighth Amendment rights. Summary judgment is therefore warranted in favor of the defendants on this claim.[4]

## IV.    Other Pending Motions

There are pending motions that must be addressed. First, Murphy filed what he titled "Permission to File Motion Seeking Perjury Violation." ECF 131. He contends that he has evidence that defendants Major Wardlow, Lt. Lott, and Counselor Craig committed perjury in the affidavits attached to their summary judgment motion. Specifically, Murphy points to their statements that they could not recall any smoke or smoke-related problems that impacted DCH from June 18, 2021, and September 3, 2021. ECF 122-2 at 3; ECF 122-3 at 2; ECF 122-4 at 2. Murphy attaches a written report from a fire chief who was called to respond to a fire in a cell in

---

[4] Because the Court concludes Murphy did not provide sufficient evidence to satisfy the objective component of his Eighth Amendment claim, it does not reach the defendants' alternative arguments that Murphy did not satisfy the subjective component of his claim or that they are entitled to qualified immunity.

DCH on July 25, 2021, and argues this proves that the defendants committed perjury. ECF 131-1 at 6.

The fact that there were fires in DCH during the relevant time does not imply that the defendants committed perjury when they stated in 2024 that they could not recall smoke-related problems in DCH in 2021. Had Murphy included this information in his summary judgment response, it might have created a disputed fact about whether these defendants were aware in 2021 of smoke-related problems, but that would not have changed the Court's conclusion that Murphy did not have evidence that he was exposed to unreasonably high levels of smoke while he was housed in DCH such that it caused him serious existing health problems or posed an unreasonable risk of serious damage to his future health. Any relief Murphy is seeking related to perjury will be denied.

Murphy also moves to add additional evidence to his summary judgment motion. ECF 133. He seeks to add a grievance he filed, complaining about his requests to be seen by a heart specialist being denied. ECF 133-1. It appears he was seeking to be seen by a specialist in order to obtain evidence that links his high blood pressure to the smoke exposure he endured in DCH, and he wants the Court to infer a causal connection from the prison's denial of his request. The Court cannot make that inference. The defendants provided evidence that Murphy is receiving treatment for high blood pressure. The prison must provide Murphy constitutionally adequate care for his serious medical needs, not an expert opinion for litigation at the state's expense.

Finally, Murphy filed a motion for Permission to Refile Retaliation Motion with Exhibits ECF 134 and a motion for Permission to File a Due Process Violation ECF 137. Murphy raises various issues with the delivery of legal mail at the prison and argues Major Wardlow interfered with his legal mail in retaliation for filing this lawsuit. This issue is wholly outside the scope of

this case, which concerns the conditions of confinement Murphy faced in 2021. These motions will be denied.

For these reasons, the Court **GRANTS** the defendants' summary judgment motion ECF 122 and **DENIES** Murphy's motions ECF 131, 133, 134, 137. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of the defendants and against Robert Murphy and to close this case.

SO ORDERED this 7th day of November, 2024.

s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc:     All counsel of record
        Plaintiff, *pro se*